_____
                                         )
PATRICK F. DOWNING,                      )
                                         )
                    Plaintiff,           )
        v.                               )          Civil Action
                                         )          No. 15-11853-PBS
OMNICARE, INC., JEFFREY STAMPS,          )
JOHN WORKMAN, NITIN SAHNEY,              )
JOHN FIGUEROA, and PRISCILLA             )
STEWART-JONES,                           )
                    Defendants.          )
_____)

**MEMORANDUM AND ORDER**

October 25, 2017

Saris, C.J.

**INTRODUCTION**

Plaintiff Patrick F. Downing was employed by Defendant
Omnicare, Inc., a pharmacy services company, from 2004 until his
termination in 2012. Plaintiff alleges that, in terminating his
employment, Omnicare and Defendants Jeffrey Stamps, John
Workman, Nitin Sahney, John Figueroa, and Priscilla Stewart-
Jones[1], retaliated against him in violation of Massachusetts
General Laws Chapter 151B (Counts I and II). Plaintiff asserts
additional claims, including tortious interference with his
advantageous or contractual relationship with Omnicare (Count
III), breach of contract (Count IV), breach of the covenant of

_____
[1]    Defendant Stewart-Jones is deceased.

good faith and fair dealing (Count V), and violation of Chapter 93A (Count VI).

Defendants Omnicare, Stamps, Workman, Sahney, and Figueroa have moved for summary judgment on all claims. After a hearing and consideration of the parties' supplemental briefing, Defendants' Motion for Summary Judgment (Docket No. 46) is **ALLOWED IN PART** and **DENIED IN PART**.

**FACTUAL BACKGROUND**

The facts below are interpreted in the light most favorable to the non-moving party. Many are undisputed.

### Plaintiff's Employment

Omnicare purchased Plaintiff's family-run pharmacy business in 2004. As part of the Settlement and Release Agreement ("the Agreement"), Omnicare granted shares of restricted common stock to Plaintiff on April 1, 2008. The Agreement specified that the stock would be distributed in ten equal installments that would vest on the first ten anniversaries of the grant date. The annual vesting of the stock was "subject to and conditioned upon the continued employment of Patrick F. Downing by Omnicare as of each vesting anniversary date." Settlement and Release Agreement, Docket No. 56-44, ¶ 4. The simultaneous execution of an employment contract between Plaintiff and Omnicare was an additional condition of the Agreement.

Plaintiff became an Omnicare employee in 2005. From 2005 to his termination, Plaintiff held multiple high-level positions within Omnicare's Long Term Care Division ("LTC"). Stamps, who was President of the LTC Division, promoted Plaintiff to his final position, Division President of the Northeast Division of LTC, in late 2010 or early 2011. Throughout his entire term of employment with Omnicare, from 2005 to 2012, Plaintiff reported to Stamps.

Stamps, in turn, reported to Figueroa, who was Omnicare's Chief Executive Officer ("CEO") from January 2011 to June 2012. Workman served as president and Chief Financial Officer ("CFO") from 2011 until June 2012, when he was appointed interim CEO. During that same time period, Sahney was the head of the "specialty pharmacy" division, and Stewart-Jones was Omnicare's top human resources executive.

**Plaintiff's Belief about Stamps-Burton Relationship**

During his employment, Plaintiff believed that Stamps and Karen Burton, a member of Omnicare's clinical team, were involved in an "inappropriate" relationship. Downing Dep. at 82:13-83:9. He noticed that Stamps and Burton engaged in "flirting" and touched arms while speaking at work events. Downing Dep. at 85:23-87:7. Burton personally informed Plaintiff that she was getting a bikini wax in advance of a conference that Stamps also would be attending. Burton mentioned that she

3

drove Stamps around Boston when he was in the city for work. Plaintiff became aware that Burton and Stamps were speaking "on an almost daily basis." Downing Dep. at 83:8-9. Stamps' assistant, Erla Burnside, told Plaintiff that Burton "had strong influence over" Stamps. Downing Dep. at 84:24-85:4. In addition, Plaintiff believed that Burton had no business reason for attending events at which Stamps also was present. Plaintiff also heard that Stamps and Burton attended an event without their spouses, when significant others were welcome. Mindy Ferris, the former Senior Vice President of Operations for LTC, told Plaintiff that she believed Burton and Stamps engaged in sexual activity in a hotel room while at a conference in Amelia Island, Florida.

Defendants dispute the existence of any inappropriate relationship, explaining that Stamps and Burton were good friends and that Stamps was supportive of Burton during difficult times in her life. They also maintain that Burton worked on customer accounts and had oversight responsibilities in New York City, which explained her attendance at galas and events in the city.

From 2005 to 2007, Burton reported to Plaintiff. In late 2006, Plaintiff recommended that Burton be terminated based on her performance. After this recommendation, Stamps restructured the clinical departments, and Burton no longer reported directly

to Plaintiff. According to Plaintiff, when he recommended Burton's termination, Stamps responded, "[i]f you terminate her, I'll save her." Downing Dep. at 98:5-14.

In 2011, two regional vice president ("RVP") positions opened up in the Northeast Division, one in New York and one in New Jersey/Pennsylvania. Two women and five men applied for the New York position, and on February 24, 2011, Plaintiff hired Paul Jacques for the position. Plaintiff claims that he "sensed [Stamps'] disappointment" when the two finalists, Jacques and Michael Rosenblum, were announced. Downing Dep. at 22:21-23:21. Two women and one man were considered for the New Jersey/Pennsylvania position, and in September 2011, Plaintiff hired Dale Lewis for the position.

Burton was one of the women who applied for these positions, but she was not hired for either one. Burton was not qualified for the RVP positions, in Plaintiff's opinion. Stamps did not directly lobby for Burton's promotion to an RVP position. However, according to Plaintiff, he called Stamps after he denied Burton the RVP position; while Stamps said he understood, Plaintiff contends that Stamps acted "more coolly" toward him thereafter. Downing Aff., Docket No. 56-43, ¶ 8. Figueroa, the CEO in 2011, told Plaintiff that Stamps had made several negative statements about Plaintiff after Burton was not promoted.

During the New Jersey/Pennsylvania RVP hiring period, a new interview process was established to insulate Plaintiff and others involved from retaliation by Stamps in case Burton was not promoted. Throughout this process, Stamps criticized the candidates Plaintiff brought forward and indirectly advocated for Burton's promotion to the New Jersey/Pennsylvania RVP position by stressing the importance of "qualities that were strengths of hers," including customer relations. Downing Dep. at 61:10-21, 63:4-65:21. While Stamps did not advocate for Burton by name, Plaintiff interpreted Stamps' comments as his pushing for Burton to be promoted instead of a more qualified male applicant. Operations experience -- a qualification which both sides agree that Burton was lacking -- was a priority for the New Jersey/Pennsylvania RVP job.

After the RVP positions were filled, Plaintiff felt that Stamps was upset that he had not promoted Burton. Stamps made comments about the competency of Jacques, Lewis, and Steve Rappa -- three male RVPs -- that Plaintiff interpreted as pressure to terminate them from their jobs.

**Plaintiff's Performance and Reviews**

The quality of Plaintiff's performance is hotly contested. Prior to 2012, Plaintiff had always received performance evaluations of "exceeds requirements" and "outstanding," raises, and incentive compensation including cash bonuses and stock

awards, commensurate with those reviews. He met operational goals for his division's budget in 2011, including bed retention. Plaintiff's bed loss and retention percentages for 2011 were within one percent of all but one other LTC division.

Defendants present a very different account of Plaintiff's performance. Figueroa became concerned with Plaintiff's performance beginning in the summer of 2011. By the end of 2011 or early 2012, Figueroa told Stamps that if he did not take action against Plaintiff, Stamps would be held directly accountable for Plaintiff's poor results.

From Omnicare's point of view, for calendar year 2011 Plaintiff's Northeast Division was the worst-performing LTC division for bed loss, an important marker of performance. In December 2011, Plaintiff received official notice that a correctional facility with 11,898 beds was not renewing its bed contract with Omnicare effective February 15, 2012. Downing did not advise Figueroa, Stamps, or Workman about this setback for nearly two months. Overall, Plaintiff's 2012 bed loss through February 2012 totaled 17,347 beds. The next lowest-performing region in the bed loss category lost only 2,373 beds.

In his time as Omnicare's CEO, Figueroa introduced an executive talent review process to the company in which the senior management team, including Workman, Stamps, and Stewart-Jones, rated the executives reporting to them. In January 2012,

Stamps evaluated Plaintiff in the "medium" performance level, indicating that he was a "[s]olid performer." As part of the 2012 Talent Review Summary dated April 16, 2012, Figueroa and the rest of the senior team downgraded Stamps' rating of Plaintiff to "attention needed," reflecting that Plaintiff's performance was "inconsistent" and "inadequate."

Stamps contends that, in addition to retention concerns, Plaintiff had "two significant compliance issues" in 2011. Stamps Decl., Docket No. 46-11, ¶ 9. First, Plaintiff backdated a customer contract. The compliance department recognized the issue and timely corrected it. Defendants do not provide any detail concerning the second compliance issue. Furthermore, Plaintiff maintains that Stamps never discussed either of these compliance issues with Plaintiff.

Figueroa gave Stamps his 2011 performance review on or about February 22, 2012 and scored him an average rating of "3" on a five-point scale, which meant that he "[c]onsistently met expectations." In early March 2012, Plaintiff met with Stamps to receive his 2011 performance review. Plaintiff's overall performance rating was the same as the one Stamps had received from Figueroa: "3, Consistently Met Expectations." Figueroa suggested that Plaintiff receive a "2" rating, but Stamps gave Plaintiff a "2.85" rating which rounded up to a "3."

In their meeting, Stamps told Plaintiff that he would be receiving nearly one hundred percent of his projected cash bonus and one hundred percent of his projected incentive stock awards, but no pay raise. Figueroa told Stamps not to give a raise to the lowest-performing division president, and Defendants say that this was the reason Plaintiff did not receive a pay raise. Plaintiff claims that Stamps never explained why his salary did not increase. Plaintiff believed that the "3" review and lack of pay raise was Stamps' retaliation against him for not promoting Burton to an RVP role.

## Plaintiff's Whistleblowing Meeting with Human Resources

On April 17, 2012, Plaintiff met with Stewart-Jones, Omnicare's Director of Human Resources, to express his disappointment with his review and lack of pay raise. During this meeting, Plaintiff told Stewart-Jones about his belief that Stamps and Burton were engaged in an inappropriate workplace relationship. Plaintiff also complained that his review and lack of merit increase was retaliation "for [his] refusal to participate in the promotion or favoritism to Karen Burton" to the detriment of male employees. Downing Dep. at 165:4-12. Plaintiff remembers giving Stewart-Jones the names of the three male RVPs -- Jacques, Lewis, and Rappa -- whom he believed would have been subjected to discrimination if he had promoted Burton.

After this meeting, Stewart-Jones reported to Figueroa and Workman that Plaintiff had requested a severance package to separate from Omnicare. Plaintiff denies that he ever asked for a severance package or requested to leave Omnicare. Stewart-Jones also reported that Plaintiff had complained about Stamps' alleged relationship with Burton and Stamps' alleged retaliation against him.

Within weeks of his conversation with Stewart-Jones, Omnicare put Plaintiff on a leave of absence.[2] Plaintiff did not want to be put on a leave of absence. Figueroa stated that he put Plaintiff on leave because that was what Stewart-Jones recommended and she told him that Plaintiff wanted to leave the company. Workman agreed with Stewart-Jones' recommendation to put Plaintiff on paid leave.

During Plaintiff's leave of absence, Omnicare hired an outside attorney, Stephen Eberly, to investigate Plaintiff's complaint regarding Stamps' relationship with Burton. Eberly found that there was no evidence of sexual harassment, but he did not reach a conclusion regarding the "precise nature" of the relationship between Stamps and Burton or whether that relationship influenced Stamps' business decisions related to

---

[2]     The date on which the leave of absence began is disputed: Plaintiff claims it commenced on or about April 30, 2012; Defendants claim it began on or about May 15, 2012.

Plaintiff. Personnel Investigation -- Summary of Analysis and Conclusions, Docket No. 59-2, at 7-9.

Figueroa resigned on June 10, 2012. On June 11, 2012 Workman became acting CEO, and Sahney became acting Chief Operating Officer ("COO"). In mid-June 2012, Workman terminated Plaintiff.[3] Workman testified that he did not terminate Plaintiff because of poor performance. Rather, Workman terminated Plaintiff because Plaintiff "had expressed that he wanted to separate from the company, and it would not have been in the company's best interest to continue the relationship with Pat Downing." Workman Dep. at 141:10-22. In coming to his decision, Workman relied on Stewart-Jones' representations of Plaintiff's desire to leave Omnicare and never saw any written documentation from Plaintiff about wanting to leave the company.

Plaintiff, on the other hand, believes that his leave of absence and termination were in retaliation for his complaint to Stewart-Jones. He argues that, beginning on the day he complained to Stewart-Jones, she "engineered an action to exit [him] from the company." Pl.'s Opp., Docket No. 52, at 8. He bases this belief, in part, on communications between Stewart-Jones, Stamps, and Figueroa regarding Plaintiff's leave of

---

[3]     Whether Plaintiff was terminated on June 15, 2012 or June 18, 2012 appears to be in dispute.

absence and Omnicare's "plan for what finally happens with" Plaintiff. Docket No. 56-23 at 1.

**DISCUSSION**

**I.    Summary Judgment Standard**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence to support the nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue of material fact for trial. Quinones v. Buick, 436 F.3d 284, 289 (1st Cir. 2006). A genuine issue exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is "one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986)).

In its review of the evidence, the Court must examine the facts in the light most favorable to the nonmoving party and

draw all reasonable inferences in its favor. <u>Sands</u>, 212 F.3d at

661. Ultimately, the Court is required to "determine if 'there

is sufficient evidence favoring the nonmoving party for a jury

to return a verdict for that party.'" <u>Id.</u> (quoting <u>Anderson</u>, 477

U.S. at 249).

## II.    Retaliation Claims (Counts I and II)

Chapter 151B of the Massachusetts General Laws ("chapter

151B") makes it unlawful "[f]or an employer, by himself or his

agent, because of the . . . sex . . . of any individual . . . to

discriminate against such individual . . . in terms, conditions

or privileges of employment." Mass. Gen. Laws ch. 151B, § 4(1).

This provision's terms specify that it applies only to an

"employer." <u>Id.</u> However, individuals who are not employers may

be held liable for workplace discrimination by provisions

forbidding "any person" from "interfer[ing] with another person

in the exercise or enjoyment of any right granted or protected

by this chapter," <u>id.</u> § 4(4A), and prohibiting "any person" from

"aid[ing] . . . any of the acts forbidden under this chapter,"

<u>id.</u> § 4(5); <u>see also</u> <u>Verdrager v. Mintz, Levin, Cohn, Ferris,</u>

<u>Glovsky, & Popeo, P.C.</u>, 50 N.E.3d 778, 793 (Mass. 2016).

Retaliation is prohibited under chapter 151B. Under the

statute, it is unlawful for "any person [or] employer . . . to

discharge, expel or otherwise discriminate against any person

because he has opposed any practices forbidden under this

13

chapter." Mass. Gen. Laws ch. 151B, § 4(4). Notably, retaliation claims in the employment context are "separate and distinct" from discrimination claims. Verdrager, 50 N.E.3d at 799. "A claim of retaliation may succeed even if the underlying claim of discrimination fails, provided that in asserting her discrimination claim, the claimant can 'prove that [she] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination.'" Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 529–30 (Mass. 2011) (alteration in original) (quoting Abramian v. President & Fellows of Harvard Coll., 731 N.E.2d 1075, 1087-88 (Mass. 2000)).

To survive summary judgment on a retaliation claim, a plaintiff must put forth evidence of four elements. First, an employee must show a reasonable, good faith belief that "the employer was engaged in wrongful discrimination." Pardo v. Gen. Hosp. Corp., 841 N.E.2d 692, 707 (Mass. 2006). Second, he must provide evidence of protected activity: that the employee "acted reasonably in response to that belief" to protest or oppose the alleged discrimination. Verdrager, 50 N.E.3d at 800 (quoting Pardo, 841 N.E.2d at 707). Third, there must be proof of an adverse employment action by the employer. Id. Finally, the employee must demonstrate that the adverse action was a response to his protected activity. Id.

The fourth element is the most difficult for a plaintiff to prove, because direct evidence of a retaliatory motive seldom exists. See id. Thus, Massachusetts has adopted a burden-shifting framework to prove motive in cases like this one, where a plaintiff has not produced direct motive evidence. See id. The burden first lies with the plaintiff to show some protected activity, an adverse action, and a "causal connection" between the protected conduct and the adverse action. Id. (quoting Mole v. Univ. of Mass., 814 N.E.2d 329, 338-39 (Mass. 2004)). Then, the burden shifts to the employer, who must provide a "legitimate, nondiscriminatory reason" for the adverse action. Id. (quoting Esler v. Sylvia-Reardon, 46 N.E.3d 534, 539 n.7 (Mass. 2016)). Finally, the plaintiff must produce evidence showing that the employer's given reason for the adverse action is merely pretext for retaliation. Id.

The only element of Plaintiff's retaliation claims that is not in contention is the existence of an adverse employment action. While the exact dates of the adverse actions are disputed, Plaintiff and Defendants agree that Plaintiff was put on a leave of absence and subsequently terminated between April and June 2012. In addition, the undisputed evidence shows that, as a result of his lower evaluation in March 2012, Plaintiff did not receive a base salary raise. A less positive evaluation and a lack of salary increase are adverse actions that can form the

basis of a retaliation claim. <u>See</u> <u>Blockel v. J.C. Penney Co.,</u>
<u>Inc.</u>, 337 F.3d 17, 27 (1st Cir. 2003) (stating that jury could
find that less favorable evaluation and lower pay increase were
adverse actions).

Defendants argue that summary judgment is proper because
Plaintiff has not provided sufficient evidence of his
reasonable, good faith belief in Stamps' discriminatory conduct,
his protected activity, or a causal connection between those two
elements. The Court addresses each of these three remaining
elements in turn.

### A. Plaintiff's Reasonable, Good Faith Belief in Wrongful Discrimination

When the facts are viewed in the light most favorable to
Plaintiff, he has presented evidence from which a jury could
find that he reasonably and in good faith believed that Stamps
was engaged in conduct in violation of chapter 151B.

Defendants cite a number of cases to support their argument
that paramour favoritism is not illegal discrimination under
Title VII. <u>See</u> Defs.' Mem., Docket No. 47, at 13-14 (collecting
cases). However, these cases do not construe state law. The key
case on point construing chapter 151B is <u>Ritchie v. Dep't of</u>
<u>State Police</u>, 805 N.E.2d 54 (Mass. App. Ct. 2004). In <u>Ritchie</u>,
the plaintiff alleged that a Massachusetts state police
lieutenant and his assistant openly engaged in an office

relationship, in which they "spent time in the office kitchen together, played 'footsie,' held hands, gave each other shoulder massages, played romantic music in their shared office, and departed from work together." Id. at 57. The lieutenant allegedly asked the plaintiff -- his subordinate -- and others to contribute portions of their retroactive pay increases to fund a bonus for his assistant and another employee. Id. In addition, an internal investigation revealed that the lieutenant had shown favoritism toward his assistant in other ways, including "through overtime, time off and reprisals against other employees." Id. at 58. When the plaintiff objected to the shows of favoritism, the lieutenant purportedly made "disparaging remarks" about her. Id. at 57. The plaintiff complained to another supervisor and to a union representative and filed a sexual harassment complaint with the Harassment/Discrimination Unit of the state police based on the office romance. Id. at 58. After her formal complaint was filed, the plaintiff received lower scores on her evaluation than ever before. Id.

The plaintiff in Ritchie asserted that the facts as alleged supported claims of a hostile work environment and retaliation under chapter 151B. See id. at 58-59. The Massachusetts Court of Appeals declined to decide whether her allegations of an office romance and paramour favoritism were sufficient to state a

hostile work environment claim. See id. at 60-61. However, the
court did allow the plaintiff's retaliation claim to go forward,
holding that paramour favoritism can form the basis of a
reasonable, good faith belief that the employer was violating
chapter 151B. See id. at 62 ("[W]e conclude that the facts
alleged are sufficient to satisfy the requirement that the
plaintiff 'reasonably and in good faith' believed that the
employer was engaged in conduct in violation of [chapter
151B].").

Here, Plaintiff has presented evidence that Stamps and
Burton flirted and touched each other during their
conversations; talked almost daily; attended a function without
their spouses; drove and traveled together; and engaged in
sexual activity at a conference. Regardless of whether a
relationship actually existed, Plaintiff's observations, along
with the observations of others, reasonably led him and others
in the company to believe that Stamps and Burton were involved
in an inappropriate relationship.

Defendants argue that Plaintiff cannot establish a
reasonable, good faith belief in a Stamps-Burton relationship
because inadmissible "hearsay rumors" make up the majority of
the evidence he presents. Defs.' Mem., Docket No. 47, at 15; see
also Defs.' Reply, Docket No. 59, at 2-4. Plaintiff, however, is
correct in his contention that the statements of others

regarding the existence of a relationship are not offered to prove the truth of the matter asserted. <u>See</u> Fed. R. Evid. 801(c)(2). Instead, they are offered to show Plaintiff's state of mind and, thus, are admissible non-hearsay evidence. <u>See, e.g.</u>, <u>Xiaoyan Tang v. Citizens Bank, N.A.</u>, 821 F.3d 206, 221 n.15 (1st Cir. 2016) (considering emails on summary judgment for purpose of showing that superiors had "reason to believe" that plaintiff was poor performer).

Plaintiff also presented evidence that he believed in good faith that Stamps was engaging in favoritism towards Burton. Plaintiff testified that, when he wanted to terminate Burton in 2006, Stamps told him: "If you terminate her, I'll save her." Downing Dep. at 98:5-14. Burton also enjoyed "strong influence over" Stamps. Downing Dep. at 84:24-85:4. In 2011, during the hiring process for the New Jersey/Pennsylvania RVP, Plaintiff felt that Stamps was indirectly advocating for the promotion of Burton (instead of Lewis, a male employee) by stressing that skills she possessed would be important for the position. Even after the New Jersey/Pennsylvania RVP position was filled, Plaintiff felt pressure from Stamps to terminate the male RVPs whom Plaintiff thought were qualified. These facts support an inference that Plaintiff believed in good faith that Stamps would have engaged in gender discrimination in promotion decisions but for Plaintiff's opposition.

Plaintiff also produced evidence that Stamps acted "more coolly" toward him and made negative comments about him to Figueroa after Burton did not receive an RVP position. Downing Aff., Docket No. 56-43, ¶ 8. Plaintiff believed that Stamps retaliated against him by giving him a lower evaluation in March 2012 than ever before and by refusing to give him a salary increase. Failure to receive a raise and an evaluation where the employee "received lower scores than [he] ever previously had in some categories" can form the basis of a retaliation claim under section 4(4) of chapter 151B. Ritchie, 805 N.E.2d at 58, 63; see also Blockel, 337 F.3d at 27 (stating that jury could find that less favorable evaluation was adverse action caused by plaintiff's requests for a reasonable accommodation). While the evidence supporting Plaintiff's reasonable belief in Stamps' retaliatory conduct is relatively weak, the burden at the prima facie stage is a light one. See Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003). The facts taken in the light most favorable to Plaintiff would support an inference that he reasonably believed Stamps retaliated against him, in violation of chapter 151B.

**B.    Plaintiff's Protected Activity**

Once a plaintiff presents evidence sufficient to support his reasonable, good faith belief in employment discrimination via paramour favoritism, he must show that he reasonably

20

protested or opposed that perceived discrimination. <u>Verdrager</u>,
50 N.E.3d at 800.

Plaintiff met with Stewart-Jones, the head of human
resources, and lodged a complaint against Stamps on April 17,
2012. Complaining to the human resources department about a
supervisor's discriminatory conduct is protected activity. <u>Green
v. Harvard Vanguard Med. Assocs., Inc.</u>, 944 N.E.2d 184, 195
(Mass. App. Ct. 2011). Thus, Plaintiff has satisfied the
protected activity element of his retaliation claim.

### C.   Causal Relationship Between Protected Activity and Adverse Action: Burden-Shifting

To survive summary judgment, Plaintiff must show causal
links between (1) his opposition to Burton's hiring and his less
positive review and lack of merit increase or (2) his complaint
to Stewart-Jones and his leave of absence and termination. When
the facts are viewed in the light most favorable to Plaintiff,
he has carried his burden only with respect to the leave of
absence and termination.

Stamps' March 2012 review of Plaintiff's performance
occurred approximately six months after Plaintiff promoted Lewis
to RVP. While a six-month interval might not support an
inference of retaliation, without more, <u>see</u> <u>Mole</u>, 814 N.E.2d at
341 (holding that adverse action must "follow close[ly] on the
heels of protected activity" to allow for an inference of

causation), "temporal proximity is but one method of proving retaliation," Verdrager, 50 N.E.3d at 801 (quoting Che, 342 F.3d at 38). Plaintiff also may present evidence of "disparate treatment in the time period between the protected activity and the adverse employment action," which can lead the jury to infer that the "'pattern of retaliatory conduct [began] soon after [the protected activity] and only culminate[d] later in actual' adverse action." Id. (alteration in original) (quoting Mole, 814 N.E.2d at 341). Here, Plaintiff has provided facts showing that, after he refused to promote Burton and before the performance evaluation, Stamps seemed upset with him, acted "more coolly" toward him, and made negative comments about him to Figueroa. Downing Aff., Docket No. 56-43, ¶ 8. "When examining such evidence, [this Court] keep[s] in mind that the prima facie case is 'a small showing that is not onerous and is easily made.'" Che, 342 F.3d at 38 (quoting Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003)). These facts support an inference that Stamps' retaliatory conduct began soon after Burton lost out on the RVP jobs and culminated in the less favorable performance review.

With respect to his suspension and termination following his complaint to Stewart-Jones, Plaintiff also has produced evidence sufficient to support an inference of causation. Plaintiff was put on a leave of absence no more than one month

after his conversation with Stewart-Jones. Such immediate temporal proximity between Plaintiff's complaint and his suspension and termination makes out his prima facie case. See Calero-Cerezo, 355 F.3d at 25-26 (holding that one-month period was sufficient temporal proximity for prima facie case).

Defendants argue that a plaintiff with performance issues that predate the protected activity must show more than temporal proximity to prove a causal connection. See Defs.' Reply, Docket No. 59, at 9-10; see also Mole, 814 N.E.2d at 340 ("Where . . . problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation."); Weeks v. Lower Pioneer Valley Educ. Collaborative, No. 14-30097-MGM, 2016 WL 696096, at *12 (D. Mass. Feb. 19, 2016) (dismissing retaliation claim where defendant had pre-existing concerns about plaintiff's performance). Because Defendants have denied that Plaintiff's performance played any role in his termination, and it is hotly disputed whether there were significant performance problems, Plaintiff is not required to prove anything more in his prima facie case.

Defendants then must meet their burden of providing legitimate, non-discriminatory reasons for the adverse actions.

They claim that Stamps' evaluation was based on Plaintiff's poor performance in 2011. In addition, Figueroa told Stamps not to give an annual salary raise to the lowest-performing division president. Next, Defendants argue that Plaintiff was put on leave and terminated because, based on Stewart-Jones' representations, Figueroa and Workman believed that Plaintiff had asked to leave Omnicare. Defendants' reasoning for both adverse actions shifts the burden back to Plaintiff to show that the rationales are pretext.

With respect to the evaluation and pay raise issue, Plaintiff does not provide any evidence to rebut Defendants' legitimate, non-discriminatory reason for the action. Thus, Plaintiff cannot pursue a retaliation claim based on this particular adverse action theory.

However, his retaliation claim grounded in the leave of absence and termination survives summary judgment because Plaintiff provides evidence suggesting that Defendants' reasons were pretextual. Plaintiff disputes that he ever asked to leave his employment with Omnicare, calling into question Defendants' proffered reason for suspension and termination. In addition, Defendants suggest that Plaintiff's subpar 2011 performance motivated his termination, but Workman testified that Plaintiff's performance did not play into the decision to fire him. Thus, the only reason for termination supported by the

record is Plaintiff's alleged request to leave the company. If a jury believed Plaintiff's testimony that he never requested a severance package or separation from Omnicare, the jurors could infer that Defendants' reason for terminating him was merely pretext for retaliatory motive.

Plaintiff has raised triable issues of material fact with respect to his retaliation claims against Defendants Omnicare, Stamps, Workman, and Figueroa. However, Defendant Sahney testified that he had no involvement in any adverse action taken against Plaintiff, and Plaintiff has not provided any evidence to dispute that testimony. Accordingly, Defendants' motion for summary judgment on the retaliation claims is **DENIED** with respect to Defendants Omnicare, Stamps, Workman, and Figueroa, and is **ALLOWED** with respect to Defendant Sahney.

## III. **Contract Claims**

### A. **Tortious Interference with Advantageous and/or Contractual Relations (Count III)**

Plaintiff does not oppose Defendants' motion for summary judgment on his claim for tortious interference with advantageous and/or contractual relations (Count III). See Pl.'s Opp., Docket No. 52, at 19-20; Pl.'s Surreply, Docket No. 62, at 10. The motion for summary judgment is **ALLOWED** for Defendants Stamps, Workman, Sahney, and Figueroa on this claim.

**B.    Breach of Contract (Count IV)**

Because Plaintiff's retaliation claim against Omnicare survives summary judgment, his breach of contract claim against Omnicare must necessarily survive, as well. The terms of the Agreement state that the annual vesting of the stock is "subject to and conditioned upon the continued employment of Patrick F. Downing by Omnicare as of each vesting anniversary date." Settlement and Release Agreement, Docket No. 56-44, ¶ 4. However, Plaintiff argues that Omnicare cannot avoid its obligation under the Agreement because the company wrongfully terminated his employment.

"[O]ne who prevents the performance of a contract cannot take advantage of its nonperformance." Winchester Gables, Inc. v. Host Marriott Corp., 875 N.E.2d 527, 536 (Mass. App. Ct. 2007) (quoting Frank Fitzgerald, Inc. v. Pacella Bros., Inc., 310 N.E.2d 379, 381 (Mass. App. Ct. 1974)); see also Lobosco v. Donovan, 565 N.E.2d 819, 821 (Mass. App. Ct. 1991) ("[I]t is fundamental that a promisor may not avoid his promised performance based on the nonoccurrence of a condition, where the promisor has himself hindered or prevented its occurrence."). If a jury finds that Plaintiff was unlawfully terminated under chapter 151B, then Omnicare cannot avoid performance through its own illegal action. Since there is a disputed material fact as

to whether Plaintiff's termination constituted illegal retaliation, Defendants' motion for summary judgment on the breach of contract claim is **DENIED**.

### C. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)

Plaintiff did not oppose the motion for summary judgment on the separate claim for breach of the covenant of good faith and fair dealing (Count V). See Pl.'s Opp., Docket No. 52, at 19-20; Pl.'s Surreply, Docket No. 62, at 10. Summary judgment for Omnicare is **ALLOWED** on Count V.

## IV. Mass. Gen. Laws ch. 93A Claim (Count VI)

Finally, Plaintiff brings a claim under chapter 93A against Omnicare. He argues that this claim is based on the Agreement for the sale of his pharmacy business, not the employer-employee relationship. According to Plaintiff, the claim arises from "Omnicare's wrongful termination of [his] employment as the basis for their refusal to convey stock to him, which represents partial payment for his pharmacy." Pl.'s Surreply, Docket No. 62, at 10.

Private rights of action under section 11 of chapter 93A are only available when both the plaintiff and the defendant are involved "in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 11. A sale of a business from one party to another is sufficient to involve both parties in trade or

commerce. See T. Butera Auburn, LLC v. Williams, 986 N.E.2d 404,

414 (Mass. App. Ct. 2013). However, the protections of section

11 do not extend to the employer-employee relationship. See

Manning v. Zuckerman, 444 N.E.2d 1262, 1265 (Mass. 1983) ("An

employee and an employer are not engaged in trade or commerce

with each other."). To determine whether relief under section 11

is prohibited by the employer-employee relationship, a court

must determine whether, "taken as a whole," the allegations are

"characterized fairly as 'arising out of an employment

contract.'" Sargent v. Tenaska, Inc., 914 F. Supp. 722, 731 (D.

Mass. 1996) (quoting Mitchelson v. Aviation Simulation Tech.,

Inc., 582 F. Supp. 1, 2 (D. Mass. 1983)).

Here, the Agreement at issue was executed as part of the

sale of Plaintiff's pharmacy company to Omnicare. Plaintiff's

claim is based on the breach of the Agreement. Essentially, he

seems to argue that Omnicare's use of his unlawful termination

as an excuse to withhold unvested stock is an unfair or

deceptive act or practice. Despite the fact that the Agreement

was for the sale of his business, Plaintiff's stock benefits

were intertwined with and conditioned on his simultaneous

execution of an employment contract and his continued employment

with Omnicare. Thus, Plaintiff's allegations can be

characterized fairly as arising out of a contract for

employment-related benefits, and summary judgment is **ALLOWED** on Count VI.

## ORDER

For the foregoing reasons, Defendants' Motion for Summary Judgment (Docket No. 46) is **ALLOWED** as to Count II against Defendant Sahney, Count III against Defendants Stamps, Workman, Sahney, and Figueroa, Count V against Omnicare, and Count VI against Omnicare. The motion for summary judgment is **DENIED** in all other respects. **A final pretrial conference will be held on November 27, 2017 at 9:00 A.M. A jury trial is scheduled for December 4, 2017 at 9:00 A.M.**

SO ORDERED.                          /s/ PATTI B. SARIS ____
                                     Patti B. Saris
                                     Chief United States District Judge